## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Elizarov Consulting Group, LLC,                     Civ. No. 19-1082 (MJD/BRT)

        Plaintiff,

v.                                                  **REPORT AND**
                                                    **RECOMMENDATION**
DTN, LLC,

        Defendant.

---

John J. Hay, Esq., Dentons US LLP; and Vicki J. Bitner, Esq., Briol & Benson, PLLC, counsel for Plaintiff.

K. Jon Breyer, Esq., Kutak Rock LLP, counsel for Defendant.

---

BECKY THORSON, United States Magistrate Judge.

### INTRODUCTION

Plaintiff Elizarov Consulting Group, LLC ("ECG") has filed a case against Defendant DTN, LLC ("DTN") for (1) breach of a Gentlemen's Agreement, (2) breach of a Mutual Nondisclosure Agreement, (3) promissory estoppel, and (4) unjust enrichment. (Doc. No. 25, Am. Compl.) This matter is before the Court on Defendant DTN's Motion to Dismiss Plaintiff's First Amended Complaint (Doc. No. 59), for failure to state a claim. The motion has been referred to this Court for a Report and Recommendation under 28 U.S.C. § 636 and D. Minn. LR 72.1. (Doc. No. 68.) On August 16, 2019, this Court held a hearing on the matter in which counsel appeared on behalf of each party. (*See* Doc. No. 79.) For the reasons stated below, this Court recommends that Defendant's

motion be denied.

## ALLEGED FACTS

According to Plaintiff ECG, in May 2016, DTN was a business intelligence company that sold weather stations and services in the United States but had not expanded its business to Kazakhstan or the greater Central Asia region. (Am. Compl. ¶ 7.) ECG, a consulting company, had various contacts in Central Asia, had been working on projects in Kazakhstan, and had experience acting as a consultant for developing global business relationships. (*Id.*) At that time, ECG and DTN began exploring a business relationship. (*Id.* at 6.)

On May 20, 2016, ECG and DTN entered into a Mutual Nondisclosure Agreement ("NDA"). (*Id.* at 9.) Shortly thereafter, ECG began disclosing to DTN confidential information concerning ECG's business contacts in Kazakhstan and other Central Asian countries. (*Id.* at 11.) ECG alleges that pursuant to the NDA, "both ECG and DTN agreed to strict prohibitions against using confidential information disclosed by the other party for purposes not set forth in the NDA." (*Id.* at 9.) The purposes for which confidential information could be used pursuant to the NDA were for "obtaining engineering feedback; furthering the business relationship between the parties; evaluation in anticipation of a business relationship between the parties; modification of a party's product(s) to enhance compatibility with the other party's products; or 'as may otherwise be mutually agreed to by the parties hereto in writing in advance of such use.'" (*Id.* at 10.) During the next two years, ECG arranged for DTN to meet several of ECG's key

government contacts, including Embassy representatives of Kazakhstan, Azerbaijan, and Georgia. (*Id.* at 12.) In October 2016, DTN expressed its pleasure with ECG's efforts in an email. (*Id.* at 13.)

On January 1, 2017, ECG and DTN entered into a Reseller Agreement under which ECG was granted a world-wide license to resell DTN's services. (*Id.* at 14–15.) According to ECG, the Reseller Agreement was limited to resale of services and "did not include goods such as weather stations or provide for ECG to provide other services to DTN."[1] (*Id.* at 15.) No sales were made under the agreement in early 2017. (*Id.* at 16.) In mid-2017, ECG and DTN had conversations about the nature of their business relationship, which included discussions about ways that they would partner together to exploit the Central Asian market. (*Id.* at 19.) Over the course of the next few months, ECG and DTN met with various government representatives from Kazakhstan, Uzbekistan, Georgia, and Azerbaijan. (*Id.* at 20–21.) Plaintiff alleges that following a meeting on August 11, 2017, with a Republic of Kazakhstan Delegation where the attendees discussed various business opportunities for DTN in Kazakhstan, ECG and DTN entered into a "Gentlemen's Agreement" whereby DTN "agreed that its business in Kazakhstan and the Central Asia region relating to its weather stations and services would be exclusively through ECG or its subsidiaries," and that in return, "ECG agreed

---

[1]    Defendant DTN disputes that the Reseller Agreement was limited to services and asserts that it was a non-exclusive agreement that "define[d] the terms by which Elizarov would facilitate the sale of DTN's meteorological data and information in Europe and Central Asia." (Doc. No. 61, Def.'s Opening Br. in Supp. of its Mot. to Dismiss the Am.

(Footnote Continued on Next Page)

to market DTN's services and products, including their weather stations, in the region."
(*Id.* at 21, 23.) Plaintiff alleges that the Gentlemen's Agreement was entered into by
Mr. Peter Jones (Vice President of International Business) on behalf of DTN and
Mr. Yakov Elizarov (President and CEO) on behalf of ECG, and that the conversation
took place while Mr. Elizarov was in Maryland. (*Id.* at 6, 24.)

Plaintiff alleges that ECG and DTN agreed on specific terms and intended to be
bound by the Gentlemen's Agreement, making it a valid contract. (*Id.* at 25.) In
particular, Plaintiff alleges the following:

- DTN promised ECG that ECG would be DTN's exclusive agent with respect to dealings in Kazakhstan.

- All inquiries in the region were to go through ECG.

- DTN agreed that it would provide the goods and services ECG was able to obtain orders for in Kazakhstan.

- ECG agreed to obtain business for DTN in Kazakhstan.

- ECG agreed to obtain business for sales of both services and goods.

(*Id.*) Plaintiff alleges that this agreement was different from the Reseller Agreement
because in the Reseller Agreement ECG was to only sell services, and under the
Gentleman's Agreement ECG agreed to "affirmatively seek out and build business and
connections for DTN in Kazakhstan, and ECG agreed to seek out business opportunities

---

(Footnote Continued from Previous Page)

Compl. ("Def.'s Br.") 1.)

4

for selling DTN's goods (its weather stations)." (*Id.* at 28.) Plaintiff also alleges that the Gentlemen's Agreement did not provide that the contract was to be performed outside of one year; instead, Plaintiff alleges that the Gentlemen's Agreement could have been performed within one year. (*Id.* at 26–27.)

In addition, Plaintiff alleges that ECG reasonably relied on DTN's promises made in the Gentlemen's Agreement, and took actions to seek out leads, customers, and opportunities for DTN in Kazakhstan, including arranging meetings, securing memorandums of understanding, and submitting a purchase order (dated August 28, 2017) for ten weather stations for Kazakhstan. (*Id.* at 29.) Plaintiff claims that as part of their agreement, there was an understanding "that delivery of the stations would be postponed until they received commitments from Kazakhstan government representatives, and that ECG would not have to pay the invoice for the purchase order until payment had been received from the Kazakhstan government." (*Id.* at 30.)

Plaintiff asserts that Mr. Jones acknowledged the Gentlemen's Agreement in a September 13, 2017 email to Mr. Elizarov, by stating the following:

> As per our gentleman's agreement, any inquiries related to your sales efforts in KZ or other countries will come to me directly. I will then forward those back to you for follow up. We want you to follow up with leads, customers and opportunities. This is our standard operating procedure with all of our VARS in key locations. Remember, we don't have a lot of partners and there is a lot of virgin territory to play in.

(*Id.* at 32.) Mr. Jones also said the following: "Regarding exclusivity, we *typically* enter into non-exclusive agreements with all of our VARS. DTN does not allow exclusive

5

agreements except for special circumstances." (*Id.* at 33 (emphasis added in Complaint).) According to Plaintiff, it was the understanding of the parties that the Gentlemen's Agreement constituted an exclusive agreement, even if DTN did not typically enter into exclusive agreements. (*Id.* at 34.) Plaintiff alleges that the parties began to put the terms of the Gentleman's Agreement in writing; DTN sent ECG several drafts, which, according to Plaintiff, were rejected by ECG because they did not reflect the terms to which the parties had agreed. (*Id.* at 35.)

In the meantime, DTN and ECG began working on a Pilot Program, which entailed selling equipment, software, and service to entities associated with the Kazakhstan government. (*Id.* at 36.) In November 2017, DTN sent ECG a signed document declaring that ECG was the official representative of DTN and granting ECG the right to sell DTN's equipment and services. (*Id.* at 39.) Plaintiff alleges the Pilot Program was the first step in a large project whereby DTN would sell thousands of weather stations to Kazakhstan entities; in late 2017 and early 2018, ECG secured several memorandums of understanding relating to the Pilot Program. (*Id.* at 36–37.) In February 2018, ECG claims that through its subsidiary it participated in a Kazakhstan government tender RFP process that resulted in ECG winning the bid in March 2018, which meant that ECG was to deliver DTN's weather stations and provide weather services to Kazakhstan, and the plan was to begin with ten stations. (*Id.* at 41.)

Plaintiff alleges that DTN failed to perform and comply with its obligations by failing to timely deliver the ten weather stations, among other things required of DTN

under the Pilot Program. (*Id.* at 44.) This resulted in the Pilot Program being canceled, ECG being barred from doing business in Kazakhstan, and "destroying ECG's project for the delivery of thousands of weather stations and associated services in Kazakhstan." (*Id.* at 44–45.) Plaintiff also alleges that DTN then made efforts to take the business that ECG had developed in Kazakhstan for itself, excluding ECG (i.e., DTN used the business contacts and confidential information provided by ECG to seek to contract with the Kazakhstan government to supply its weather stations and services to Kazakhstan without ECG). (*Id.* at 46–48.)

ECG filed its Complaint against DTN relating to these business dealings on September 17, 2018. (Doc. No. 1.) ECG thereafter filed an Amended Complaint on November 16, 2018, which is the operative complaint in this matter. (Doc. No. 25, Am. Compl.) In the Amended Complaint, ECG asserts four counts against DTN: (1) Count I for breach of the Gentlemen's Agreement, (2) Count II for breach of the Mutual Nondisclosure Agreement, (3) Count III for promissory estoppel, and (4) Count IV for unjust enrichment. (*See generally* Doc. No. 25, Am. Compl.)

## DISCUSSION

### A.  Standard of Review

To survive a motion to dismiss for failure to state a claim, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 500 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with

enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. This standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Id.* at 556. In applying this standard, the Court must assume the facts in the complaint to be true and must construe all reasonable inferences from those facts in the light most favorable to the plaintiff. *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012). But the Court need not give effect to those allegations that simply assert legal conclusions. *McAdams v. McCord*, 584 F.3d 1111, 1113 (8th Cir. 2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

### B.  COUNT I – Breach of Gentlemen's Agreement[2]

Defendant DTN argues that Count I must be dismissed because the alleged Gentlemen's Agreement was not a valid contract since it covers the same subject matter as the Reseller Agreement and does not provide consideration beyond what was already

---

[2]    The parties dispute what state's law applies to the breach of Gentlemen's Agreement and breach of NDA claims. Defendant asserts Minnesota law applies, as that is what the choice of law provision provides in the Reseller's Agreement. Plaintiff argues that Maryland law applies to the Gentlemen's Agreement under a choice-of-law analysis, that Delaware law applies to the NDA, and that Minnesota law does not apply because ECG is not asserting a claim under the Reseller's Agreement. Because—as the parties appear to agree—both Minnesota and Maryland law are similar with respect to Plaintiff's claims, as are Minnesota and Delaware law, the Court need not determine the choice-of-law question to determine the outcome of the motion to dismiss.

promised in the Reseller Agreement. Defendant further argues that Plaintiff has not alleged that DTN breached the agreement. Plaintiff disagrees.

It is apparent that the parties dispute whether the Reseller Agreement and the Gentlemen's Agreement cover the same subject matter. Any dispute about whether the Gentlemen's Agreement covers the "same" subject matter and involves the "same" consideration, however, is a fact issue better left for summary judgment or trial. *See Messina v. N. Cent. Distrib., Inc.*, No. 14-CV-3101 (PAM/KMM), 2017 WL 2345572, at *2 (D. Minn. May 30, 2017) ("The existence and terms of a contract are ordinarily questions of fact to be determined by the jury."); *Eisenberg v. Air Conditioning, Inc.*, 225 Md. 324, 335 (1961) ("This Court [has] held that the existence and terms of an oral contract, when disputed, are for the trier of facts to determine."). On a motion to dismiss—which is what we have here—the Court looks to the allegations made in the Amended Complaint. Here, Plaintiff expressly alleges that the Gentlemen's Agreement and the Reseller Agreement cover different subject matters – i.e., goods versus services, and exclusivity versus non-exclusivity. Taking Plaintiff's allegations as true, the Amended Complaint alleges separate consideration for the Gentlemen's Agreement. The Amended Complaint also alleges that DTN breached the agreement by failing to timely deliver ten weather stations and by violating the exclusivity term. While DTN asserts that those allegations of breach are not supportable,[3] that is not the question before the Court

---

[3]    Defendant DTN argues that ECG cannot assert breach of contract based on DTN's failure to fulfill the purchase order for weather stations because it asserts ECG did not

(Footnote Continued on Next Page)

on a motion to dismiss. Instead, the question is whether Plaintiff has plead facts that plausibly support a claim for breach, which this Court concludes that it has.

Defendant DTN also argues that the Amended Complaint does not provide allegations that support that there was a meeting of the minds with respect to the essential terms of the alleged Gentlemen's Agreement. Specifically, Defendant asserts that because ECG rejected the draft written terms of the Gentlemen's Agreement (and because there had been no performance between when the alleged meeting took place and that

---

(Footnote Continued from Previous Page)

comply with the terms of the purchase order. Defendant DTN also points to the September 13, 2017 email that says that DTN "typically enter[s] into non-exclusive agreements with all of [their] VARS" and that "DTN does not allow exclusive agreements [for those that] require the VAR to guarantee an amount of sales product per year," to show that, if anything, the Gentlemen's Agreement was a non-exclusive agreement and therefore DTN could not have breached the agreement by working with other parties in Kazakhstan. (Def.'s Br. 20.) This email, however, can be reasonably read to support Plaintiff's assertion, as was pleaded in the Amended Complaint, that even though non-exclusive agreements were the typical arrangements made by DTN, this particular Gentlemen's Agreement was exclusive and fell outside the typical arrangement. And the argument regarding the purchase order involves a fact dispute since ECG alleges that it has complied with all of the terms and conditions required of it pursuant to the Gentlemen's Agreement, and specifically that ECG would not have to pay the invoice for the purchase order until payment had been received from the Kazakhstan government. (Am. Compl. ¶ 30.) For purposes of evaluating a motion to dismiss, the Court must assume the facts in the complaint to be true and must construe all reasonable inferences from those facts in the light most favorable to Plaintiff. Any arguments relating to whether there is a material fact dispute are better raised in motions for summary judgment, and any remaining fact disputes are better resolved through trial. *See Mono Advert., LLC v. Vera Bradley Designs, Inc.*, 285 F. Supp. 3d 1087, 1091 (D. Minn. 2018) ("[A] question of fact . . . cannot be resolved on a motion to dismiss.").

rejection) there was no meeting of the minds.[4] This argument is unavailing. Plaintiff

specifically alleged that the Gentlemen's Agreement was entered into by Mr. Jones on

behalf of DTN, and Mr. Elizarov on behalf of ECG, that the conversation took place

while Mr. Elizarov was in Maryland, and that ECG and DTN agreed on specific terms

and intended to be bound by the Gentlemen's Agreement. (Am. Compl. ¶¶ 24, 25.)

Plaintiff also alleges essential terms of the Gentlemen's Agreement:

- DTN's business in Kazakhstan and the Central Asia region relating to its weather stations and services would be exclusively through ECG or its subsidiaries.

---

[4]    Defendant DTN also argues that because the Amended Complaint is silent as to any other essential terms (i.e., compensation, duration, ect.), then there must not have been a meeting of the minds. The cases that Defendant cites to in support of this argument are inapposite. *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164 (Md. App. 2015) addresses a situation where the underlying agreement contained an agreement to agree. There is no similar allegation here. And *Tiger Team Tech. v. Synesi Gp., Inc.*, No. 06-1273 (ADM/AJB), 2009 WL 749814 (D. Minn. Mar. 18, 2009) highlighted a situation—on summary judgment—where it was clear that an essential term was to have a paid royalty, and at the time of the alleged agreement, the royalty was yet to be determined. Here, it is not evident that compensation, or any other term not specifically alleged, was an essential term of the Gentlemen's Agreement, and if it were, it is not evident that the term had not been determined at the time of the meeting of the minds as alleged in the Amended Complaint. Not all essential terms of an agreement need be pleaded in a complaint to sufficiently allege a breach of contract to survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (quotations omitted); *see also Morrisette v. Harrison Int'l Corp.*, 486 N.W.2d 424, 427 (Minn. 1992) ("[T]he existence and terms of a contract are questions for the fact finder."); *Igbanugo v. Cangemi*, No. A10-2002, 2011 WL 2519205, at *2 (Minn. Ct. App. June 27, 2011) ("While the complaint does not allege the terms of the contract with specificity, the allegations in the complaint are specific enough to demonstrate respondent's obligations under the agreement and to put respondent on notice as to the bases of appellants' claims.").

11

- ECG would market DTN's services and products, including their weather stations, in the region.

- ECG would be DTN's exclusive agent with respect to dealings in Kazakhstan.

- All inquiries in the region were to go through ECG.

- DTN would provide the goods and services ECG was able to obtain orders for in Kazakhstan.

- ECG would affirmatively seek out and build business and connections in Kazakhstan for the purpose of obtaining business for sales of both services and goods for DTN in Kazakhstan.

(Am. Compl. ¶¶ 23–28.) Taking Plaintiff's allegations as true and viewing them in the light most favorable to Plaintiff, not only was there a meeting of the minds, but the meeting of the minds occurred prior to the drafting process. And it is at least plausible that Plaintiff's rejection of the drafts was not evidence that there was no meeting of the minds, but instead was evidence that ECG was simply rejecting the drafts, as written, because they did not accurately reflect what the terms of the agreement were. Therefore, Defendant's argument that Plaintiff did not plead a meeting of the minds fails.

Finally, Defendant DTN asserts that the Gentlemen's Agreement is unenforceable because as an oral contract it is subject to the statute of frauds and the agreement was never reduced to a signed writing.[5] The statute of frauds states that no action shall be

---

[5]     The parties dispute whether the Gentlemen's Agreement was a contract for goods or a contract for services. For purposes of determining whether the pleading is sufficient to survive a statute of frauds challenge at this stage, the Court need not settle this dispute, because even assuming the Gentlemen's Agreement was a contract for goods, Defendant's argument fails for the reasons stated herein.

maintained upon any agreement that, by its terms, cannot be performed within one year unless the agreement is in writing. *See* Minn. Stat. § 513.01; MD Code Ann. Cts & Jud. Proc. § 5-901. As pleaded, the Gentlemen's Agreement was capable of being performed within one year. *See Macsherry v. Sparrows Point, LLC*, No. CV ELH-15-22, 2017 WL 3315262, at *24 (D. Md. Aug. 3, 2017) (explaining that the statute does not bar actions on an oral contract where there is no express provision stating that the agreement is to extend beyond a year or clear demonstration that the agreement must so extend); *Peterson v. Petersen*, No. C9-88-1875, 1989 WL 38394, at *1 (Minn. Ct. App. Apr. 25, 1989) ("The test under the statute of frauds is not whether performance could take longer than a year or whether performance actually did take longer than a year, but whether it is possible for performance to [be] completed within one year."). Defendant does not dispute that, as pleaded, the Gentlemen's Agreement was capable of being performed within one year. (*See* Doc. No. 78, Reply Br. in Supp of Def.'s Mot. to Dismiss 7–8.) Therefore, Defendant's statute of frauds argument fails. This finding, however, does not preclude Defendant from re-raising this argument after further fact discovery.

Based on the above, and the allegations in the Amended Complaint, this Court concludes that the Amended Complaint plausibly supports a claim for breach of the Gentlemen's Agreement, and Defendant's motion should be denied in this regard.

13

### C. COUNT II – Breach of Mutual Nondisclosure Agreement

Defendant DTN makes two arguments as to why Count II should be dismissed. First, DTN argues that Count II must be dismissed because the NDA only provides for relief upon the wrongful use of "Confidential Information," and Plaintiff does not sufficiently allege that its business contacts were deemed "Confidential" under the NDA. This Court disagrees. ECG expressly alleges that its government and business contacts constitute confidential information under the NDA. (*See* Am. Compl. ¶ 11 ("Shortly after entering into the NDA, ECG began disclosing to DTN its confidential information concerning its business contacts . . ."); ¶ 47 ("DTN used the business contacts and confidential information provided it by ECG to seek to contract with the Kazak government . . ."); ¶ 60 ("ECG's government and business contacts constitute confidential information under the NDA, i.e. its confidential business/customer list."). More specificity at this stage is not required.

Second, Defendant argues that the Reseller Agreement—not the NDA—governs the terms of DTN's relationship with ECG's contacts with Kazakhstan, and therefore any claim based on ECG's contacts must be based on the Reseller Agreement, not the NDA. Even if it is true that the Reseller Agreement continued to govern the relationship between DTN and ECG, Defendant's argument for dismissal on this ground fails because the Reseller Agreement expressly states that the provisions of the NDA remain in full force and effect. (*See* Doc. Nos. 62, 63, Decl. of Matthew R. Veenstra ¶ 2, Ex. 1 at ¶ 8(c) ("If the parties have executed a separate Non-Disclosure or Confidentiality Agreement,

14

then the confidentiality obligations, terms and conditions of such agreement shall prevail and supersede the foregoing confidentiality provisions and continue through the Term of this Agreement.").) Therefore, it is plausible that the Reseller Agreement incorporated the NDA provisions.

For these reasons, Defendant DTN's two arguments fail, and this Court concludes that the Amended Complaint plausibly supports a claim for breach of the NDA.

### D. COUNTS III and IV – Promissory Estoppel and Unjust Enrichment

Defendant DTN argues that Plaintiff's promissory estoppel and unjust enrichment claims are based on ECG's efforts to sell DTN's information services in Kazakhstan. And because ECG's efforts to sell DTN's information services in Kazakhstan are the subject of the Reseller Agreement (or the Gentleman's Agreement), which is a valid and existing contract governing that subject matter, Defendant asserts that ECG cannot pursue claims for promissory estoppel or unjust enrichment.[6] Because promissory estoppel and unjust enrichment are equitable claims, they ultimately may be unavailable if a valid contract defines the rights and remedies of the parties that are sought through those equitable claims. *See McKenzie v. Lunds., Inc.* 63 F. Supp. 2d 986, 1004 (D. Minn. 1999) ("As a general rule . . . promissory estoppel is not available where a contract exists."); *Watkins*

---

[6]     DTN also asserts that ECG cannot satisfy the "promise" element of a promissory estoppel claim because DTN did not promise that ECG would be DTN's exclusive agent with respect to dealings in Kazakhstan. As stated above, however, ECG has pleaded that DTN did make such a promise, and the email that DTN points to plausibly supports Plaintiff's claim.

*Inc. v. Chilkoot Distributing, Inc.*, 719 F.3d 987, 994 (8th Cir. 2013) (affirming dismissal of counterclaims finding that "equitable relief is unavailable in Minnesota where . . . the rights of the parties are governed by a valid contract") (citing *U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981)); *but see Dryer v. Nat'l Football League*, 689 F. Supp. 2d 1113, 1123 (D. Minn. 2010) ("The mere existence of a contract, even a contract that purports to address the subject matter of the unjust enrichment claim, will not void all unjust enrichment claims ab initio.").

Here, however, Plaintiff asserts that it is basing its promissory estoppel and unjust enrichment claims on rights and obligations that extend beyond those contained in the Reseller Agreement. Therefore, taking Plaintiff's allegations as true that the Gentlemen's Agreement and the NDA defined the rights and obligations at issue in this case, the Reseller Agreement itself does not preclude Plaintiff from asserting promissory estoppel and unjust enrichment claims. Furthermore, Plaintiff, at this stage, can plead promissory estoppel and unjust enrichment in the alternative to its breach of the Gentlemen's Agreement and NDA claims. *See Krutchen v. Zayo Bandwidth Ne., LLC*, 591 F. Supp. 2d 1002, 1018 (D. Minn. 2008) (permitting promissory estoppel claim, which was "duplicative" of a breach of contract claim, to proceed as an alternative theory subject to later challenge as the record developed more fully); *Transp. Drivers, Inc. v. Coca-Cola Refreshments USA, Inc.*, No. CV 16-1074 (DWF/BRT), 2017 WL 1954772, at *13 (D. Minn. May 10, 2017) (allowing promissory estoppel claim based on a contract claim to proceed to discovery when parties disputed whether valid contract governs); *see also,*

16

*e.g.*, *Mono Advert., LLC v. Vera Bradley Designs, Inc.*, 285 F. Supp. 3d 1087, 1091

(D. Minn. 2018) (permitting alternative pleading of unjust enrichment and contract

claims). The Federal Rules of Civil Procedure allow for such alternative pleading. *See*

Fed. R. Civ. P. 8(d)(2) (allowing a party to "set out 2 or more statements of a claim or

defense alternatively or hypothetically").

　　　For all of the above reasons, and because this Court concludes that Plaintiff has

alleged enough facts to show plausible claims for relief, Defendant's motion to dismiss

Plaintiff's Amended Complaint should be denied.

## RECOMMENDATION

　　　Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

　　　1.　　Defendant DTN's Motion to Dismiss Plaintiff's First Amended Complaint

(Doc. No. 59) be denied.


Date:  October 10, 2019

　　　　　　　　　　　　　　　　　　　*s/ Becky R. Thorson*
　　　　　　　　　　　　　　　　　　　BECKY R. THORSON
　　　　　　　　　　　　　　　　　　　United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the
District Court and is therefore not appealable directly to the Eighth Circuit Court of
Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written
objections to a magistrate judge's proposed finding and recommendations within fourteen
(14) days after being served a copy" of the Report and Recommendation. A party may

respond to those objections within fourteen (14) days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.